| | |
|---|---|
| DISTRICT COURT, CITY & COUNTY OF DENVER<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | EFILED Document<br>CO Denver County District Court 2nd JD<br>Filing Date: Jul 7 2011 11:22AM MDT<br>Filing ID: 38557971<br>Review Clerk: Leanne Youn Galanti |
| **KRISTAL CARRILLO,**<br><br>Plaintiff,<br><br>v.<br><br>The **CITY AND COUNTY OF DENVER**, a municipality,<br>Officer **RICKY NIXON**, in his individual and official capacity,<br><br>Defendants. | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiff<br>Qusair Mohamedbhai, # 35390<br>Siddhartha H. Rathod, # 38883<br>KILLMER, LANE & NEWMAN, LLP<br>1543 Champa St., Ste. 400<br>Denver, CO 80202<br>(303) 571-1000 (phone)<br>(303) 571-1001 (fax)<br>qmohamedbhai@kln-law.com<br>srathod@kln-law.com | Case No:<br><br><br><br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

Kristal Carrillo ("Plaintiff" or "Ms. Carrillo"), by and through her attorneys, Qusair Mohamedbhai and Siddhartha H. Rathod of KILLMER, LANE & NEWMAN, LLP, alleges the following Complaint and Jury Demand against the City and County of Denver ("Denver") and Ricky Nixon ("Officer Nixon") (collectively referred to as "Defendants") and in support states as follows:

## I. INTRODUCTION

1.      This is an action for damages and injunctive relief against Defendants for violating Ms. Carrillo's rights under the First and Fourth Amendments of the Constitution of the United States. Ms. Carrillo, while seated on the ground, feet in front of her, detained in handcuffs, was punched in the face by Officer Nixon. Ms. Carrillo was further assaulted by Officer Nixon because of her verbal objections to unlawful police misconduct. Denver's customs, policies or practices were the driving force behind Ms. Carrillo's constitutional rights



EXHIBIT
*B*

violations. The actions of Officer Nixon were captured by a High Activity Location Observation ("HALO") camera.

2.      This is an action for damages and injunctive relief against Defendants for violating Ms. Carrillo's rights under the First and Fourth Amendments of the Constitution of the United States.

## II. JURISDICTION AND VENUE

3.      This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to Title 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

4.      Venue is proper in this Court pursuant to COLO. R. CIV. P. 98(c), in that all of the events alleged herein occurred within the City and County of Denver.

5.      The Court has jurisdiction over the claims asserted herein pursuant to C.R.S. § 13-1-124, Title 42 U.S.C. Sections 1983 and other applicable law.

## III. PARTIES

6.      At all times relevant to the subject matter of this litigation, Ms. Ortega was a citizen of the United States of America and a resident of the State of Colorado.

7.      Denver is a Colorado municipal corporation. Denver's Department of Safety is responsible for the oversight, supervision, and training of the Denver Police Department ("DPD"). Denver was at all relevant times the employer of Officer Nixon and is a proper entity to be sued under 42 U.S.C. § 1983.

8.      At all times relevant to the subject matter of this litigation, Officer Nixon was a citizen of the United States, a resident of Colorado and was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

## IV. BACKGROUND AND FACTUAL ALLEGATIONS

9.      On July 11, 2009, Ms. Carrillo, and her friends, Ana Ortega, Mariam Pena and Cintia Vindel were socializing in lower downtown Denver. The four women were having fun, and the night proceeded without incident.

10.      In the early morning of July 12, 2009, the group went to the Denver Diner restaurant. The Denver Diner was very busy that morning, and the group placed their names on the waitlist.

11.      All four women were in a long line to use the diner's restroom. Ms. Ortega and Ms. Carrillo entered the bathroom together.

12.     An unknown woman who was waiting in line for the restroom observed Ms. Ortega and Ms. Carrillo enter the bathroom together.  The unknown woman uttered homophobic profanities to Ms. Ortega and Ms. Carrillo.

13.     Moments later the unknown woman shoved Ms. Ortega and Ms. Carrillo.

14.     A shoving match ensued between Ms. Carrillo and the unknown woman.  Ms. Ortega was not involved in the altercation.

15.     Officer Nixon, in Denver police uniform, working as off duty security at the Denver Diner approached and violently grabbed Ms. Carrillo.  Officer Nixon proceeded to punch Ms. Carrillo in the back and back of her head.  Officer Nixon handcuffed Ms. Carrillo inside the diner and aggressively dragged her outside.  Once outside Officer Nixon forcibly threw Ms. Carrillo to the ground.

16.     Ms. Ortega, Ms. Pena and Ms. Vindel followed Officer Nixon and Ms. Carrillo outside the Denver Diner.  The three women were upset that Officer Nixon had unnecessarily assaulted Ms. Carrillo, especially because the other unknown woman had started the altercation.

17.     Ms. Ortega, Ms. Pena and Ms. Vindel all asked Officer Nixon why he had assaulted their friend.  Ms. Ortega asked Officer Nixon why he was not arresting the other woman who had started the physical altercation.  Finally, Ms. Ortega asked if she could gather Ms. Carrillo's wallet and broken necklace, which had fallen from her possession when she was violently removed from the diner.

18.     During this time, Ms. Ortega was approximately five feet away from Officer Nixon as he was pinning Ms. Carrillo to the ground.  An unknown male employee from the Denver Diner was in between Ms. Ortega and Officer Nixon.  *See* HALO Still Video Image 1.



**HALO Still Video Image 1**[1]

*Ms. Ortega (far left) is wearing a salmon/pink colored skirt with a white blouse; Officer Nixon (third from left) is a uniformed Denver Police Officer and Caucasian male with a shaved head who is wearing black gloves; Ms. Pena (far right) is wearing a red dress and has brown hair; Ms. Carrillo (on ground) is wearing jeans and a black t-shirt with a light red pattern in the front, currently handcuffed and seated with her head pressed forward; and an unknown Caucasian male (second from left) wearing a gray shirt and black pants is an employee from the Denver Diner.*

19.     Officer Nixon did not respond to Ms. Ortega, or anyone else.

20.     In that Officer Nixon refused to respond, Ms. Pena and Ms. Ortega moved away from Officer Nixon and Ms. Carrillo.

21.     As Ms. Ortega and Ms. Pena were walking towards the curb, and away from Officer Nixon, at approximately 1:30 a.m., Kelly Boren and Sharelle Thomas were attempting to enter the front door of the Denver Diner. *See* HALO Still Video Image 2.

---

[1] HALO video available at http://www.thedenverchannel.com/video/27519846/index.html (last visited July 7, 2011).



**HALO Still Video Image 2**

*Ms. Vidal (top right) is wearing a white top and a black skirt; Ms. Ortega (bottom right); Officer Nixon (second from left); Ms. Pena (middle); Ms. Carrillo (on ground); unknown Denver Diner male (far left); and Ms. Boren and Ms. Thomas (far right) are currently not visible as they are behind the bicycle and tree.*

22.     A few hours prior, Ms. Boren, Ms. Thomas, Fransisco Macias, and Jay Spencer had been in the lower downtown area celebrating Ms. Thomas' recent graduation from Colorado Christian University.

23.     Ms. Boren, Ms. Thomas, and their two friends had used two bicycle taxis to travel to the Denver Diner from lower downtown.

24.     As Ms. Boren and Ms. Thomas approached the front door of the diner, Mr. Macias and Mr. Spencer were very close by and paying the two bicycle taxis for their service.

25.     Ms. Boren and Ms. Thomas had no idea of the events that had just occurred between law enforcement and Ms. Ortega, Ms. Carrillo, and her two friends.  Prior to July 12, 2009, Ms. Boren, Ms. Thomas and their two friends had never met Ms. Ortega, Ms. Carrillo and their two friends.

26.     Not wanting to get involved with the current actions by law enforcement occurring outside the diner, Ms. Boren and Ms. Thomas approached the front door, staying well clear of law enforcement.

27.     Suddenly, and without any reason or provocation, mere feet away from the front door of the diner, Ms. Thomas was shoved from behind by Officer Devine.

28.     Ms. Thomas and Ms. Boren turned, and observed Officer Devine standing right next to them, smoking a cigar with a baton in his right hand.

5

29.     Ms. Boren said words to the effect we did not do anything wrong.

30.     Ms. Thomas informed Officer Devine that he did not have to push her like that or words to that effect. Officer Devine then responded, words to the effect I don't give a fuck, shut the fuck up, and pointed his baton at Ms. Thomas in a threatening manner.

31.     While protesting Officer Devine's conduct, Ms. Thomas' and Ms. Boren's hands were in the air, in a non-threatening manner. *See* HALO Still Video Image 3.



**HALO Still Video Image 3**

*Officer Devine (top middle) is a uniformed Denver Police Officer with brown hair, holding a baton in his right hand; Ms. Boren and Ms. Thomas (far right) are currently obstructed as they are behind the bicycle and tree, although Ms. Thomas' arm can be seen coming into the picture from behind the tree; Ms. Ortega (bottom middle); Officer Nixon (top left); Ms. Pena (bottom right); unknown Denver Diner male (far left); Ms. Carrillo (on ground); and Ms. Vidal (top right).*

32.     At no time did Ms. Ortega, Ms. Thomas, Ms. Boren or Ms. Carrillo act aggressively towards any members of law enforcement.

33.     After telling Ms. Thomas to shut up, Officer Devine placed his cigar in his mouth and with his free hand lunged at Ms. Thomas, tightly gripping her right arm. Officer Devine then began to violently pull her away from the diner's front door.

34.     While violently jerking Ms. Thomas' arm, Officer Devine raised his baton to strike Ms. Thomas' head, but stopped his baton's momentum before contact.

35.     Officer Devine pulled Ms. Thomas with such force that she was moved several feet away from the doorway of the Denver Diner. *See* HALO Still Video Images 4-5.

 

**HALO Still Video Image 4**                    **HALO Still Video Image 5**

*Ms. Boren (far right) is a Caucasian female, standing next to the bicycle taxi, with blond hair wearing a red dress and white blouse. Ms. Thomas (far right) is African-American, standing to the right of Ms. Boren. Both women are facing Officer Devine (middle), who is grabbing and pulling on Ms. Thomas' right arm. In Image 4, Officer Devine can be seen smoking a large cigar.*

36.     Recognizing that Ms. Thomas was being unlawfully assaulted by a member of law enforcement, Ms. Boren and Mr. Spencer attempted to assist her. Ms. Boren verbally protested Officer Devine's treatment of Ms. Thomas. At no time did Ms. Boren act aggressively or otherwise touch Officer Devine or any member of the DPD.

37.     As Officer Devine pulled Ms. Thomas, with his other hand he grabbed Ms. Boren's throat, and pushed her with such extreme force as to knock her backwards seven to ten feet and onto the ground, causing serious bodily injury including bruising and scraping to her body. *See* HALO Still Video Images 6-9.



*Ms. Boren is pushed by Officer Devine and thrown backwards onto the ground. Fransisco Macias and Jay Spencer (top right) and other males are seen as well.*

38.    Ms. Ortega observing Officer Devine assaulting Ms. Thomas and Ms. Boren, attempted to assist. Ms. Ortega told Officer Devine that the two women had nothing to do with the prior incident inside the diner. Ms. Ortega asked Officer Devine to stop hurting Ms. Thomas. At no time did Ms. Ortega touch any member of law enforcement or act aggressively.

39.    Officer Devine then threw Ms. Thomas to the ground. Once on the ground, Officer Nixon pinned Ms. Thomas, prohibiting her from getting up. *See* HALO Still Video Image 10.



**HALO Still Video Image 10**

*Ms. Thomas is on the ground at the feet of Officer Nixon after being thrown down by Officer Devine. Ms. Thomas is unable to get up at this point.*

40.     Officer Devine then turned his attention to Ms. Ortega and acted aggressively towards her, waiving his baton in a striking manner near her head.

41.     Ms. Ortega took a few steps back from Officer Devine, and raised her hands, palms forward, asking Officer Devine to stop hurting people. Ms. Ortega was trying to get Officer Devine to calm down.

42.     Officer Devine took his cigar out of his mouth and threw it to the ground. He then lunged towards Ms. Ortega and with his baton and shoved her backwards. Officer Devine then grabbed Ms. Ortega's left arm, partially spun her, and pulled her towards him. Ms. Ortega fell to her knees, and Officer Devine placed Ms. Ortega's left arm behind her back, and in a wrist lock. While holding Ms. Ortega's arm behind her back, Officer Devine forcibly placed his baton in between Ms. Ortega's neck and shoulder blade. Ms. Ortega was subdued, and at no time was she resisting arrest or combating Officer Devine. Ms. Ortega suffered bruising to her chest due to Officer Devine's violence against her. *See* HALO Still Video Images 11-14.



**HALO Still Video Image 11**  **HALO Still Video Image 12**

**HALO Still Video Image 13**  **HALO Still Video Image 14**

43.     At this moment, Officer Nixon released Ms. Thomas.  He did not inform her that she was under arrest or that she was to remain on the ground.

44.     Officer Nixon approached Ms. Ortega while she was on her knees, restrained by Officer Devine.  At point blank range, Officer Nixon pepper sprayed Ms. Ortega in the face and eyes.  Ms. Ortega was immediately overcome with extreme and severe pain.  Ms. Ortega screamed out, asking why she had been pepper sprayed.  *See* HALO Still Video Image 15.



**HALO Still Video Image 15**

45.     Having been released by Officer Nixon, Ms. Thomas and Ms. Boren moved towards the door of the Denver Diner. Officer Nixon turned around from Ms. Ortega's location, and at close range, deliberately pepper sprayed Ms. Thomas in the face and eyes, and then Ms. Boren in the face and eyes. Ms. Boren and Ms. Thomas were instantly over come with a severe burning sensation and immense pain. Officer Nixon said nothing prior to pepper spraying Ms. Ortega, Ms. Thomas and Ms. Boren. *See* HALO Still Video Images 16-17.



**HALO Still Video Image 16**                    **HALO Still Video Image 17**

*Officer Nixon is pepper spraying Ms. Thomas (Image 16), and then approaching closer and pepper spraying Ms. Boren (Image 17).*

46.     Ms. Boren and Ms. Thomas entered the Denver Diner and proceeded to the bathroom so they could rinse out their eyes and wash their faces.

47.     Ms. Ortega was handcuffed by Officer Devine and another Denver police officer.

Officer Devine, while handcuffing Ms. Ortega, pulled her hands and arms up towards the sky, causing Ms. Ortega to shriek in pain. At no time was Ms. Ortega resisting when she was handcuffed. *See* HALO Still Video Image 18.



**HALO Still Video Image 18**

*Ms. Pena (middle) wearing the red dress is pleading with Officer Devine to not hurt Ms. Ortega.*

48.     As Ms. Boren and Ms. Thomas walked out of the bathroom, unable to see clearly and still in immense pain, two police officers rushed into the Denver Diner and arrested Ms. Thomas. While restrained in handcuffs, Ms. Thomas was violently pushed outside the diner and pushed onto the concrete. She was required to remain seated in handcuffs, next to Ms. Ortega. Ms. Ortega's and Ms. Thomas' eyes were burning due to being pepper sprayed, and neither could see clearly.

49.     A member of Denver's law enforcement approached Ms. Ortega. Ms. Ortega pleaded for medical assistance. The police officer ignored her requests and walked away.

50.     Ms. Ortega believed she observed a paramedic close to her, and she stood up trying to get medical attention.

51.     Officer Nixon grabbed Ms. Ortega, who was still handcuffed behind her back, by the throat with both of his hands and body slammed her to the concrete. Ms. Ortega suffered injuries to her neck and arms. *See* HALO Still Video Images 19-22.



| HALO Still Video Image 19 | HALO Still Video Image 20 |
| HALO Still Video Image 21 | HALO Still Video Image 22 |

52.     Observing Ms. Ortega's assault, Ms. Carrillo verbally objected and opposed Officer Nixon's unlawful conduct.

53.     Officer Nixon then grabbed Ms. Carrillo by her head, while she was still handcuffed behind her back, and threw her onto the ground.  Officer Nixon lunged forward, with his body's momentum behind him, and punched Ms. Carrillo in the face.  Ms. Carrillo instantly felt blood gushing from her nose.  *See* HALO Still Video Images 23-25.



**HALO Still Video Image 23**        **HALO Still Video Image 24**



**HALO Still Video Image 25**

54.     Ms. Carrillo was charged with four Denver Municipal Code violations of Resistance, Disturbing the Peace, Assault, and Public Fighting.

55.     Officer Nixon pushed Ms. Ortega onto her knees, which caused her pain since her raw skin was scrapping against the concrete. Officer Nixon then held Ms. Ortega in place by the back of her neck while she was on her knees, telling her words to the effect of sit the fuck down. Officer Nixon was using considerable force trying to shove Ms. Ortega's head into her knees. This caused Ms. Ortega to start to suffocate as her airway became impinged. Ms. Ortega gasped while she spoke pleading to Officer Nixon that she could not breathe.

56.     Officer Nixon then tightened the grip on the back of Ms. Ortega's neck, and moved her head and body upwards, by her neck, and violently threw her onto the concrete. This caused considerable pain to Ms. Ortega. *See* HALO Still Video Images 26-27.



**HALO Still Video Image 26**          **HALO Still Video Image 27**

57.     Officer Nixon then lifted Ms. Ortega to her feet by her handcuffs, which caused Ms. Ortega more pain and bruising to her shoulder, arms and wrist.

58.     Then holding the chain between the handcuffs, Officer Nixon dragged Ms. Ortega to a law enforcement vehicle, where she was placed inside the vehicle with the windows rolled up. *See* HALO Still Video Images 28-29.



**HALO Still Video Image 28**          **HALO Still Video Image 29**

59.     Ms. Ortega begged the police officer for medical attention, but was ignored. Ms. Ortega asked for the identification of the law enforcement officer standing outside the police vehicle in which she sat, but was ignored.

60.     Approximately ten to fifteen minutes later, a paramedic sprayed a liquid onto Ms. Ortega's face. She was not provided a towel, and tried to wipe her face with her blouse, while in handcuffs.

61.     From the time that Ms. Thomas was violently pulled outside the diner to when Ms. Ortega was pepper sprayed and placed into a law enforcement vehicle, Ms. Boren was

largely ignored by members of Denver's law enforcement. For some time, Ms. Boren observed members of the DPD washing their skin and eyes with saline. Ms. Boren observed the brutality done onto Ms. Ortega and Ms. Carrillo, and saw her friends in pain due to the pepper spraying, including Ms. Thomas who was overcome with severe pain, restrained in handcuffs, and begging for medical assistance. *See* HALO Still Video Image 30.



**HALO Still Video Image 30**

62.    Later on, Ms. Boren approached Officer Nixon and objected to how she and her friends had been treated, and how they were unnecessarily pepper sprayed in the face. Officer Nixon told Ms. Boren to leave the area or she would be arrested. At no time was Ms. Boren acting aggressively towards Officer Nixon.

63.    Ms. Boren again protested the police misconduct, and asked Officer Nixon why he had pepper sprayed herself and her friends. Officer Nixon did not answer Ms. Boren's questions, and instead stated words to the effect that if you don't go away, I will arrest you.

64.    At that point, Officer Nixon arrested Ms. Boren and charged her with two Denver Municipal Code violations of Interference and Failure to Obey a Lawful Order. Ms. Boren was released from jail on bond after spending one night in-custody.

65.    Ms. Thomas observed members of the DPD washing their skin and eyes with saline. Ms. Thomas asked if she could also have saline to wash her skin and eyes and was informed by the member of Denver's police department to shut the fuck up.

66.    Ms. Thomas observed paramedics at the scene and again asked police officers if the paramedics would treat her injuries. She was again told to shut the fuck up. Ms. Thomas asked for the police officer's badge number, but was ignored.

67.    Approximately thirty minutes later, without explanation, Ms. Thomas' handcuffs were removed and she was told to leave the area. Ms. Thomas was not charged with any crime.

68.     As a result of being man handled, grabbed, pulled, and thrown to the ground by Officer Devine, and sprayed in the face and eyes at close range with pepper spray by Officer Nixon, Ms. Thomas was transported by ambulance to the Denver Health hospital where she was treated for her injuries.

69.     While at Denver Health, Ms. Thomas was treated for injuries including having a "foreign body" removed from her eye.

70.     Due to the injuries Ms. Thomas suffered at the hands of Officer Devine and Officer Nixon on September 28, 2010, Ms. Thomas underwent a surgical procedure to repair an atrophic retinal hole in the superotemporal periphery of her left eye.

71.     On or about July 13, 2009, Ms. Boren and Ms. Thomas filed a complaint with the Internal Affairs Bureau of the DPD stating, among other things, that Officer Devine and Officer Nixon used excessive force, were discourteous and failed to provide identification cards upon request.

72.     On or about July 16, 2009, Ms. Ortega and Ms. Carrillo filed a complaint with the Internal Affairs Bureau of the DPD stating, among other things, that Officer Devine and Officer Nixon used excessive force.

73.     On or about July 17, 2009, due to Defendants' failure to produce exculpatory evidence and fabrication of inculpatory evidence, Ms. Ortega succumbed to the pressures of facing a criminal trial and pled guilty to a deferred judgment of one Municipal Code violation.

74.     On or about July 17, 2009, due to Defendants' failure to produce exculpatory evidence and fabrication of inculpatory evidence, Ms. Carrillo succumbed to the pressures of facing a criminal trial and pled guilty to a deferred judgment of one Municipal Code violation.

75.     On October 2, 2009, due to Defendants failure to produce exculpatory evidence, and fabrication of inculpatory evidence, Ms. Boren succumbed to the pressures of facing a criminal trial and pled guilty to a deferred judgment of one Municipal Code violation.

76.     In April 2011, due to media coverage, Ms. Ortega, Ms. Boren, Ms. Thomas, and Ms. Carrillo learned that a HALO camera captured the constitutional violations they each had suffered at the hands of Defendants. Despite being in the possession and control of the DPD, the video capturing the events leading up to Ms. Ortega's, Ms. Boren's, and Ms. Carrillo's arrest were not turned over to them or their attorneys in the discovery phase of their criminal prosecutions.

77.     HALO cameras are strategically placed around the city of Denver and are constantly recording. HALO cameras are controlled remotely at DPD headquarters, 1331 Cherokee Street, by Denver personnel. The Denver personnel who control the HALO cameras have the ability to pivot the HALO camera and magnify an area of interest. DPD officers and DPD Internal Affairs investigators are trained on the locations of HALO cameras. HALO

camera images are destroyed if not requested within 30 days of the recording.

78.    Nearly two years after Defendants committed the constitutional violations as described herein on Ms. Ortega, Ms. Boren, Ms. Thomas, and Ms. Carrillo, Officer Nixon and Officer Devine were terminated for "misconduct relating to the incident, including finding that the officers used inappropriate force and were untruthful regarding the incident."

79.    Ms. Ortega and Ms. Boren are currently attempting to withdraw their guilty pleas in Denver County Court.

### Denver's Custom, Practice, and Policy of Excessive Force & Unlawful Seizures

80.    Plaintiff's injury at the hands of Denver law enforcement officers is an example of the overwhelmingly common use of excessive force by law enforcement officers throughout Denver.

81.    On January 15, 2009, a mere six months prior to Plaintiff's constitutional violations caused by Defendants, including <u>Officer Nixon</u>, Alexander Landau, an African American, was assaulted during a traffic stop by <u>Officer Nixon</u> and other members of the DPD. Mr. Landau was driving with Addison Hunold when he was pulled over. Mr. Landau did not have his wallet, so he could not provide any identifying information to the officers. He exited the car as instructed. Mr. Hunold informed the officers that he had a small amount of marijuana and he was placed in handcuffs. The officers began searching Mr. Landau's car. When they tried to open the trunk, Mr. Landau asked if they had a warrant authorizing a search of the trunk. Two of the officers then grabbed each of Mr. Landau's arms, and a third officer punched him in the face with no provocation. One of the officers then yelled that Mr. Landau was going for a gun, even though he was not, and the officers continued to beat him in the face and head with their fists, a radio, and a flashlight. Racist epithets were spewed at Mr. Landau, who is African American. More officers arrived on the scene and joined the assault. An officer pointed his gun at Mr. Landau's head and threatened to shoot him. Paramedics arriving on the scene documented that Mr. Landau was found lying prone on the curbside, handcuffed behind his back, bleeding from the head, with lacerations and in acute distress. Mr. Landau was transported by ambulance to the hospital, where he was treated for a broken nose, lacerations, and serious closed head injuries, including a large hematoma, a concussion, and a hemorrhage in his right eye. The case recently settled for $795,000.

82.    The following cases provide only representative examples of the rampant use of excessive force by Denver law enforcement officers and the lack of any training or supervision on the part of the City and County of Denver to prevent this dangerous and unconstitutional conduct.

83.    The City of Denver has created, fostered, and tolerated an environment and culture of law enforcement brutality and deliberate indifference to the constitutional rights of citizens and residents.

84.     The Denver Department of Safety consists of both the DPD and the Denver Sheriff's Office.  Law enforcement officials from both branches of the Department of Safety have repeatedly and unlawfully used excessive force against citizens.

85.     Denver law enforcement officers have engaged in a persistent practice of law enforcement misconduct, and the officials responsible for assuring that such misconduct does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct.

86.     This culture and environment of brutality and the lack of training, supervision, and discipline of law enforcement officers is evidenced by, among other things, the sheer volume of lawsuits filed against and/or legal settlements with Denver law enforcement alleging excessive force, the involvement of dozens of different law enforcement officials in those lawsuits, and the repeated involvement of the same officers in multiple lawsuits.

87.     For example, Denver City Attorney David Fine reported to the Denver City Council in September of 2010 that the city of Denver has spent nearly $6.2 million since 2004 to settle lawsuits involving police officers, and nearly all of the payouts were for allegations of excessive force.  Council members had asked Fine to research litigation patterns after controversy erupted the previous month over a video that showed an officer beating a 23-year-old man who was talking on a cell phone.[2]

88.     These statistics do not even include lawsuits against the City and County of Denver arising out of Sheriff's Department conduct.

89.     Between January and June of 2010, seventeen Denver police officers were associated with excessive force complaints, a higher ratio per law enforcement officer than any other U.S. City.[3]

90.     Since 2004, the average settlement in Denver for an excessive-force claim against the police was about $97,000.  The city paid nearly $3 million to settle three lawsuits, pushing the average up.  In all, the city paid out $5 million in settlements for excessive force since 2004.[4]

91.     In 2008, the City of Denver and Denver Health paid a combined $7 million to the family of Emily Rae Rice, who had died while in custody of the Denver Sheriff's Department.  Ms. Rice had alleged that the City's treatment of her after she was detained violated her

---

[2] Christopher N. Osher, *Denver has spent nearly $6.2 million since 2004 to settle suits against police*, DENVER POST, Sept. 15, 2010, *available at* http://www.denverpost.com/news/ci_16076344.

[3] Joel Warner, *Police Misconduct: Denver ranks number one in terms of excessive force complaints*, Westword, Sept. 10, 2010, *available at* http://blogs.westword.com/latestword/2010/09/police_misconduct_denver_ranks_number_one_in_terms_of_excessive_force_complaints.php.

[4] Christopher N. Osher, *Denver has spent nearly $6.2 million since 2004 to settle suits against police*, DENVER POST, Sept. 15, 2010, *available at* http://www.denverpost.com/news/ci_16076344.

constitutional rights leading directly to her death.   It was alleged that the City had destroyed or otherwise tampered with video and other evidence, and had engaged in a cover-up of the wrongdoing.  After initially denying any liability on any of the claims, the Defendants paid $7 million and agreed to many policy changes.  Defendant Faun Gomez was a Defendant in both the present case and the case brought on behalf of Emily Rice.  Upon information and belief, Defendant Gomez received no disciplinary action for her role in either the death of Emily Rice or the death of Marvin Booker.

92.     Also in 2008, Denver paid $150,000 to Timothy Borenon, who was deprived of medical care while in the city jail.[5]  Mr. Borenon was arrested on charges of cultivating marijuana.  While being transported to jail, he informed the officers that he was suffering from terminal Stage IV non-Hodgkin lymphoma, and that he was taking massive amounts of pain killers and anxiety medications.  The officers assured him that they would bring his medications to the jail.  Once he arrived at the Pre-Arraignment Detention Facility, however, his repeated pleas for medication were ignored.  A judge ordered his release, but he was forced to spend several more hours in jail, without his medication, until he suffered a seizure, banging his head on the cement floor of his cell.  Mr. Borenon alleged that his treatment by the Denver Sheriff's Department violated his constitutional rights.[6]

93.     In 2004, Denver paid the family of Paul Child $1.32 million to settle a lawsuit brought after Mr. Childs, a developmentally disabled 15 year-old boy, was fatally shot by Denver Police Officer James Turney.[7]  Officer Turney responded to a 911 call from Mr. Childs' sister, and when he arrived at the house, Mr. Childs was holding a knife.  When Mr. Childs refused to drop the knife, Officer Turney shot and killed him.  Two other officers were in the house with non-lethal tasers, which were not used.  Mr. Childs' mother informed officers that he was a "special needs" child, but they nonetheless shot him from the front door while he was standing in the hallway.[8]

94.     In 2004, Denver paid Terrill Johnson $75,000 to settle a lawsuit against the City, Denver Police Chief Gerald Whitman, and Denver Police Officers Troy Ortega, Louis A. Estrada, Perry Speelman, Richard Eberharter, Randy Yoder, and Danny Perez.  Mr. Johnson alleged that as he was driving home from his job at Denver International Airport, he noticed he was being followed closely by a Denver Police patrol car.  The officers in the car followed him to his residence.  He went into his home, and when he went back outside to take out the garbage, the officers, still in their patrol car, were shining a spotlight into his car, which he had parked in

---

[5] Michael Roberts, *The City Council pays out to Timothy Borenon*, WESTWORD, Aug. 19, 2008, *available at* http://blogs.westword.com/latestword/2008/08/the_city_council_pays_out_to_t.php.

[6] Alan Prendergast, *Pain Management: Cancer patient Tim Borenon didn't think he could feel any worse.  His Denver jailers showed him that he could.*, WESTWORD, July 31, 2008, *available at* http://www.westword.com/2008-07-31/news/pain-management/.

[7] Christopher N. Osher, *Denver has spent nearly $6.2 million since 2004 to settle suits against police*, DENVER POST, Sept. 15, 2010, *available at* http://www.denverpost.com/news/ci_16076344.

[8] John C. Ensslin & Hector Gutierrez, *Slain teen 'loved' cops*, ROCKY MOUNTAIN NEWS, July 8, 2003, http://m.rockymountainnews.com/news/2003/Jul/08/slain-teen-loved-cops/.

front of the house. As the officers reversed the patrol car, they slammed into Mr. Johnson's wife's car. Mr. Johnson approached his wife's car to inspect the damage, and the officers exited the patrol car with their weapons drawn. They instructed Mr. Johnson, who was not armed, to throw down his weapon. Additional officers arrived at the scene, continuing to instruct Mr. Johnson to drop his weapon. He removed his shirt and raised his hands into the air to show the officers that he was not armed. The officers then rushed toward Mr. Johnson, slammed him onto a patrol car, punched him, forcibly subdued him while handcuffing him, and threw him into the patrol car, using racial slurs the entire time. Mr. Johnson was charged with two minor traffic offenses and interference; all charges against him were dropped.

95.     On February 25, 2004, Regina Keith filed a lawsuit on behalf of the estate of Gregory Lee Smith, Jr. against the City and County of Denver, Denver Police Chief Gerald Whitman, Denver Police Officers Robert Silvas and Jim Turney, and unknown John Doe Officers. Ms. Keith, Mr. Smith's mother, alleged that the officers arrived at her home after she called 911 for assistance with a domestic dispute. When they arrived, Mr. Smith was in his bedroom. Mr. Smith then exited his bedroom with a three-inch utility knife. The officers ordered him to drop the knife, and when he didn't, they fatally shot him. Upon information and belief, the individual officers settled the case for an unknown amount.

96.     On December 6, 2004, Richard Rra-Shada filed a lawsuit against the City and County of Denver, Denver Police Officers Dennis Bedenbender and Shanna Michael, and Robert A. Kaser. Mr. Rra-Shada alleged that Officer Bedenbender struck him with his police vehicle. When Mr. Rra-Shada responded with a profanity, Officer Bedenbender got out of his police vehicle, approached Mr. Rra-Shada, and clipped his legs from underneath him, causing him to fall head-first onto the pavement. Officer Michael then hit Mr. Rra-Shada with her nightstick and kicked him repeatedly in his torso. At the same time, Officer Bedenbender was punching Mr. Rra-Shada in the head with closed fists. Mr. Rra-Shada's injuries included head and brain trauma, as well as injuries to his shoulder, wrist, back, ribcage, and abdomen. He also began suffering seizures after the incident. Upon information and belief, the case was settled for an unknown amount.

97.     On July 1, 2005, Jeffrey R. Mayton filed a lawsuit against the City and County of Denver and Denver Police Officers Josh E. Valerio, Gerard Alarcon, and Robert J. Wycoff. Mr. Mayton alleged that he was wrongfully arrested, and that during his arrest, the officers ignored his complaints that he was ill. When Mr. Mayton began to struggle due to physical discomfort from his illness, the officers used excessive force against him, resulting in a dislocated shoulder, abrasions, and bruising. Because the officers ignored Mr. Mayton's complaints about his illness, he defecated in his clothing and was forced to remain sitting and lying on the ground in pain until transport arrived. Upon information and belief, the case was settled for an unknown amount.

98.     On August 5, 2005, Quincy Michael Shannon filed a lawsuit against the City and County of Denver, Denver Mayor John Hickenlooper, and Denver Police Officers Boren McKibben and Chan Thanong. Mr. Shannon alleged that, while he and three friends were waiting in their car in a parking lot, they were approached by an officer who told them they could wait five more minutes for their friends to come out of a nightclub, and then they would have to move their car. Another officer then approached the car and told them to move. The

driver attempted to move the car, but the parking lot was full of cars.  A third officer then approached the car and sprayed mace or pepper spray into the driver's face.  The driver tried again to move the car, but was unable to.  Another officer then approached and sprayed the other occupants of the car with mace or pepper spray.  All of the passengers then exited the car, which was filling up with fumes from the spray.  Mr. Shannon asked Officer McKibben how they were supposed to move the vehicle when the parking lot was full, and in response Officer McKibben sprayed him in the face again.  Mr. Shannon then walked away and dialed 911 to report the incident.  Officer McKibben overheard Mr. Shannon describing him on the phone and sprayed him again.  When Mr. Shannon turned away, Officer McKibben grabbed Mr. Shannon's arm and bent it behind him.  Officer McKibben then kicked Mr. Shannon's feet out from under him and shoved his face into the pavement.  Officer McKibben then grabbed both of Mr. Shannon's arms and one leg, handcuffing his hands behind his back over his ankle.  Officers McKibben and Officer Thanong then picked Mr. Shannon up and sprayed him in the face again.  Mr. Shannon suffered cuts and scrapes to his face, resulting in a permanent scar.  Upon information and belief, the case was settled for an unknown amount.

99.     On March 31, 2002, Mary Milham was at a Denver bar called Sing Sing, located in the LoDo section of downtown Denver.  As Ms. Milham was leaving she made a remark about a particularly obnoxious bouncer to her brother.  While talking to her brother, she was confronted with off-duty Denver Police Officers in police uniforms, one being Defendant Danny Perez, #95032.  Ms. Milham was not being violent or threatening in any way when one of the officers grabbed Ms. Milham's wrist and applied a "low profile twist lock" on her and snapped her humerus like a twig while propelling her into a brick wall.  This brutal assault caused extensive injuries to Ms. Milham as well as significant physical and psychological trauma.  These officers then proceeded to file false charges against her knowing that she had committed no offense.  All charges against Ms. Milham were dismissed in Denver County Court on August 14, 2002.  A jury in federal court found Perez to be liable to Milham for violating her constitutional rights and using excessive force and damages were awarded.  Despite this finding, Denver took no disciplinary action against Perez.

100.    On November 21, 2005, David Nettles filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Carlette Havard, Michael Nuanes, Jr., Damian Naranjo, and Zachary Phillips.  Mr. Nettles alleged that the officers, while responding to a domestic violence call across the street from Mr. Nettles's house, decided to apprehend Mr. Nettles.  In effectuating the unlawful arrest of Mr. Nettles, one of the officers began punching him in the ribs, while another used nunchucks on Mr. Nettles's ankle, causing him to fall to the ground.  While Mr. Nettles was on the ground, another officer kicked him in the head at least three times.  One or more officers jumped onto Mr. Nettles's back, yelling, "when we give you an order, you obey it!"  Another officer began punching Mr. Nettles in the back of the head, yelling, "you did it to your own damn self!"  While the officers were attempting to handcuff Mr. Nettles's hands behind his back, he heard his shoulder snap.  After he was handcuffed, the officers continued hitting him in the head and kicking him in the back.  Mr. Nettles's injuries included a severe shoulder injury and bruising to his ribs, arms, left elbow, and knees.  Upon information and belief, the case was settled for an unknown amount.

101.    On January 6, 2006, Francisco Juan Lobato, Anthony Lobato, Barbara Lobato, and Ramona Lobato filed a lawsuit on behalf of the estate of Frank Lobato against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Ranjan Ford, Jr., Joshua Herrick, Gene Sharla, Robert Shiller, Charles Kyle, Steven Addison, and unidentified John and Jane Doe Officers.  The Lobatos alleged that the Defendant Officers entered the Lobato home without a warrant looking for a suspect.  Frank Lobato was sleeping in his bed at the time the officers entered the home.  When the officers were unable to locate the suspect, they entered Mr. Lobato's bedroom and shot and killed him.  Denver paid $900,000 in 2007 to settle the lawsuit.[9]

102.    On April 3, 2006, Hirut Berhanmeskel filed a lawsuit against the City and County of Denver and Denver Police Officer Gilberto Romero.  Ms. Berhanmeskel alleged that, while she was attempting to resolve a parking ticket dispute at the Denver Parking Ticket Referee's office, she was approached by Officer Romero.  Officer Romero, apparently upset that Ms. Berhanmeskel was crying about her inability to resolve her parking ticket issue, grabbed Ms. Berhanmeskel's arm violently and roughly twisted it behind her back.  He slammed her against the wall and handcuffed her without even warning her that he was placing her under arrest.  Ms. Berhanmeskel suffered a broken wrist as a result of the excessive force used by Officer Romero.  Upon information and belief, the case was settled for an unknown amount.

103.    On August 11, 2006, Chandler Lyles filed a lawsuit against the City and County of Denver and Denver Police Officer Ryan Burke.  Mr. Lyles alleged that Officer Burke came to his home to investigate a claim that Mr. Lyles's mother was suicidal.  Officer Burke ordered Mr. Lyles to sit on a sofa in the living room, and Mr. Lyles complied.  Then, without provocation or warning, Officer Burke tackled Mr. Lyles, forcing him to the ground and handcuffing him.  As a result of the excessive force used by Officer Burke, Mr. Lyles suffered injuries that included a broken right clavicle.  Upon information and belief, the case was settled for an unknown amount.

104.    In 2007, Amy Shroff sued the City of Denver and Officer Frank Spellman for violating her rights protected by the Fourth and Fourteenth Amendments to the Constitution.  Officer Spellman illegally arrested Ms. Shroff after she had complained to the police about her former husband's presence at a bar immediately before he was to have visitation rights with their young child under a custody arrangement that provided for her to drop the child off at the Denver Police station for pick-up by the former husband.  Officer Spellman arrested Ms. Shroff allegedly for violating a restraining order, even though the order clearly restrained the *husband* from coming near her, not the other way around.  The district court rejected Spellman's effort to have the case dismissed on summary judgment, and the 10th Circuit Court of Appeals agreed that Spellman's conduct, as alleged, would violate the clearly established rights of Ms. Shroff to be free from unreasonable searches and seizures.  The Defendants settled the case before trial in 2010 for a payment of $175,000 to Ms. Shroff.

105.    On June 12, 2007, Ross Edward Smith filed a lawsuit against the City and County of Denver and Denver Police Officers Jarrod Tinnin and Mark Sutton.  Mr. Smith alleged that while he was walking down the 16th Street Mall as part of a protest against the Iraq war, he was

---

[9] Christopher N. Osher, *Denver has spent nearly $6.2 million since 2004 to settle suits against police*, DENVER POST, Sept. 15, 2010, *available at* http://www.denverpost.com/news/ci_16076344.

approached by Officer Tinnin. Officer Tinnin had dismounted his motorcycle, and walked up to Mr. Smith and punched him in the face with a closed fist, throwing him to the pavement. Officer Sutton then joined Officer Tinnin in tackling and beating Mr. Smith. Officer Tinnin pushed Mr. Smith's face into the pavement while Officer Sutton kneeled on Mr. Smith. Mr. Smith was charged with interference, but all charges against him were dropped. As a result of the excessive force used against him, Mr. Smith suffered injuries and abrasions to his face, arms, hands, neck, and back, and aggravation of his Parkinson's Disease, causing severe and uncontrollable tremors. Upon information and belief, the case was settled for an unknown amount.

106.   On June 27, 2007, Grace Arlene Mosley filed a lawsuit against the City and County of Denver and Denver Police Officers Martin Martinez, Jose Hurtado, and unknown John Doe Officers. Ms. Mosley alleged that she was unlawfully arrested and forcefully pulled out of her home by the officers. As a result of the excessive force against her, she suffered physical pain and emotional trauma. Upon information and belief, the case was settled for an unknown amount.

107.   In 2008, Denver paid $885,000 to settle a lawsuit brought in response to an incident in which Denver Police Officers Charles Porter, Luis Rivera, and Cameron Moerman used excessive force against Juan Vasquez, a 16 year-old boy. Mr. Vasquez was severely injured with a lacerated liver and broken ribs after one of the officers used a fence as leverage to jump up and down on the boy's back while he lay prone on the pavement.[10]

108.   On November 13, 2008, Michael P. Marotta filed a complaint against the City and County of Denver, the DPD, and Denver Police Officers Cortez, Black, and Rocco-McKeel. Mr. Marotta's complaint arose out of two separate incidents with Denver Police Officers. In March 2007, Officer Cortez issued Mr. Marotta a summons for Disturbing the Peace for using the stairwells in his condominium building for exercise. When Officer Cortez was unable to serve Mr. Marotta, he obtained an arrest warrant. Officer Cortez then entered Mr. Marotta's condominium, pulling Mr. Marotta out and placing him under arrest. Mr. Marotta was locked out of his home without his hearing aid or glasses while his condominium was searched. In November 2007, Officer Rocco-McKeel came to Mr. Marotta's home, grabbing him and throwing him against a wall to effect an arrest. Mr. Marotta was handcuffed so tightly that he has a permanent scar on his wrist, and the officer shoved Mr. Marotta against an elevator wall without provocation while removing him from his building. The case is currently awaiting trial in federal court.

109.   In January 2009, Denver paid $100,000 to Trudy Trout to settle a lawsuit that arose out of Denver Police Officer Nicholas Rocco-McKee's use of excessive force. Officer Rocco-McKee shoved Ms. Trout to the ground, causing her to break her wrist. Despite the fact that the encounter was caught on video, Officer Rocco-McKee lied on his report, stating that Ms. Trout tripped over her own high heeled shoes, which she was not wearing. Upon information

---

[10] David Packman, *Is There a Police Brutality Problem in Denver?*, INJUSTICE EVERYWHERE: THE NATIONAL POLICE MISCONDUCT STATISTICS AND REPORTING PROJECT, Sept. 6, 2010, http://www.injusticeeverywhere.com/?p=3028.

and belief, Officer Rocco-McKee was not disciplined for the use of force or for lying on his report.[11]

110.    On February 25, 2009, Nick Lynch filed a lawsuit against Denver Police Officers Adam Barrot, Abigail Dorn, J. Kennedy, and unknown John Doe Officers. Mr. Lynch alleged that, as he was approaching the officers with his hands raised, the officers struck him and threw him to the ground, face down. The officers then hit him repeatedly with a nightstick or a flashlight, causing permanent injuries. The case is currently awaiting trial in federal court.

111.    On April 30, 2009, John Stephen Heaney filed a lawsuit against the City and County of Denver and Denver Police Officers James Costigan, Michael Cordova, Noel Ikeda, Luke Palmitere, and Daniel Steele. Mr. Heaney alleged that, while he was riding his bicycle near Coors Field on opening day of the baseball season, he was attacked by undercover police officers, who did not identify themselves as law enforcement agents. He was placed into a chokehold and forcibly brought to the ground, where he was punched in the head repeatedly. One of the officers grabbed him by the hair and slammed his face into the pavement, breaking two of his teeth. As a result of the excessive force used against him, Mr. Heaney also suffered severe bruising on his hands, knees, arms, and legs, as well as other injuries requiring surgery. The case is currently awaiting trial in federal court.

112.    On May 4, 2009, Jason Anthony Graber filed a lawsuit against the City and County of Denver and Denver Police Officers Miller, Davis, and two other unknown John Doe Officers. Mr. Graber alleged that, as he was crossing the 16th Street Mall at Market Street, a police officer in a marked car yelled out his window, "dumbass!" The police car then pulled up next to Mr. Graber, his brother, and his wife, and asked if they needed assistance. Mr. Graber responded that they did not need assistance, but that he did not appreciate being called a dumbass. The officers then exited their vehicle and one of them tackled Mr. Graber from behind. He was grabbed by the neck, and his legs were kicked out from under him. He fell down, slamming his knee and elbow onto the concrete. Mr. Graber was arrested for public intoxication, but a breathalyzer test showed a blood alcohol content of 0.036, well below the legal limit, and he was released. X-rays to Mr. Graber's leg showed lipohemarthrosis and a possible hairline fracture. Mr. Graber remained in a leg brace for many months after the incident. The case is currently awaiting trial in federal court.

113.    On May 15, 2009, Altagracia Medina Valencia filed a lawsuit on behalf of her deceased husband against the City and County of Denver, Denver Police Chief Gerry Whitman, and eight unknown John Doe Denver Police Officers. Ms. Valencia alleged that, while her husband, Odiceo Valencia-Lopez, was attending his daughter's communion, he suffered a self-inflicted knife wound to the wrist. When his family called for an ambulance, the call was routed to Denver Police. Eight officers arrived on the scene. Mr. Valencia-Lopez was standing by his vehicle with the knife in his hand when he was surrounded by six to eight officers with their weapons drawn. The officers ordered Mr. Valencia-Lopez to drop the knife, but due to his lack of understanding of English, blood loss, and intoxication, he did not understand their commands. An officer then tased Mr. Valencia-Lopez, causing him to drop the knife. After Mr. Valencia-Lopez was tased and dropped the knife, the other officers began shooting him. He was shot

---

[11]*Id.*

approximately seven times, in front of his entire family. He died at the scene. Upon information and belief, the case was settled for an unknown amount.

114.    On October 16, 2009, Wayne C. Rose filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald R. Whitman, Detective Mark S. Woodward, and unidentified John Doe Police Officers. Mr. Rose alleged that, while fleeing police unarmed, he was knocked to the ground by an officer on foot and then run over by an officer on a police motorcycle. The impact of the motorcycle knocked Mr. Rose unconscious, and Detective Woodward then handcuffed Mr. Rose's hands behind his back. Detective Woodward then picked Mr. Rose up by his arms and dropped him onto the pavement two or three times, causing his face and body to strike the pavement several times. Officer Woodward and the unidentified John Doe Officers then beat and kicked Mr. Rose repeatedly. Mr. Rose's injuries resulting from the officers' use of excessive force included a broken arm that required multiple surgeries. Upon information and belief, the case was settled for an unknown amount.

115.    On June 30, 2009, James R. Watkins filed a lawsuit against the City and County of Denver and Denver Police Officers John Ruddy and Randy Penn. Mr. Watkins alleged when he noticed he was being followed by the officers, he reached for his cell phone while asking them if they were going to beat him up. The officers responded by lunging toward Mr. Watkins and hitting him in the face with their closed fists and elbows. They continued beating him after he was on the ground and under police control. Mr. Watkins had to be taken by ambulance to Denver Health Medical Center because he was bleeding profusely as a result of the officers' use of excessive force. He was initially charged with Assault in the Second Degree, but all charges against him were dropped. Denver paid Mr. Watkins $20,000 to settle the lawsuit.[12]

116.    On June 30, 2009, Michael DeHerrera filed a lawsuit against the City and County of Denver and Denver Police Officers Devin Sparks, A. Jaramillo, and R. Murr. Mr. DeHerrera alleged that, while he was using his cell phone to inform his father, a Pueblo police officer, that the Denver Police Officers were assaulting his friend, the officers assaulted him. Officer Sparks used an arm bar takedown to force Mr. DeHerrera face first onto the sidewalk. Once Mr. DeHerrera was on the ground, Officer Sparks used a sap impact weapon repeatedly on Mr. DeHerrera's body, and other officers struck him in the face multiple times. Mr. DeHerrera had to be taken to the hospital by ambulance, and his injuries included head trauma and facial contusions. This incident was captured on video. Despite the aggravated circumstances, the officers were only very lightly disciplined. Since the case has received considerable publicity and public protest, the DPD has reopened an Internal Affairs investigation into the incident, which resulted in a $17,500 settlement.[13]

117.    On June 30, 2009, Shawn Kyeone Johnson filed a lawsuit against the City and County of Denver and Denver Police Officers Devin Sparks, A. Jaramillo, and R. Murr. Mr.

---

[12] David Packman, *Is There a Police Brutality Problem in Denver?*, INJUSTICE EVERYWHERE: THE NATIONAL POLICE MISCONDUCT STATISTICS AND REPORTING PROJECT, Sept. 6, 2010, http://www.injusticeeverywhere.com/?p=3028.

[13] Christopher N. Osher, *Denver has spent nearly $6.2 million since 2004 to settle suits against police*, DENVER POST, Sept. 15, 2010, *available at* http://www.denverpost.com/news/ci_16076344.

Johnson was involved in the altercation with Denver Police that resulted in Mr. DeHerrera's lawsuit. Mr. Johnson alleged that, as he was being assaulted by a club bouncer, three Denver Police Officers joined in the assault, striking him in the face with elbows and closed fists even after he was under police control. Mr. Johnson suffered severe injuries, including head trauma and facial contusions, and was taken by ambulance to the hospital. In August 2010, Denver settled the case for $15,500.[14]

118.   On August 7, 2009, James B. Bouchard filed a lawsuit against the City and County of Denver and Denver Police Officers M. Whetstone and K. Jiminez. Mr. Bouchard alleged that the officers arrived at his house in response to a call by Mr. Bouchard's former girlfriend, who wanted to retrieve her personal belongings from his house. When Mr. Bouchard refused to allow the officers to enter his home without a warrant, the officers forced their way in and used a nightstick to restrain Mr. Bouchard in his own home. He was then shoved into a wall and handcuffed. Mr. Bouchard's resulting injuries included a torn rotator cuff and bruises, contusions, and other injuries to his upper torso, face, and head. The case is currently awaiting trial in federal court.

119.   On August 10, 2009, Danvis Smith filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, Denver Manager of Safety Alvin LaCabe, and Denver Police Officer Joseph P. Flynn. Mr. Smith alleged that he was involved in an altercation with Officer Flynn, who was working on foot in the Denver International Airport parking garage. Officer Flynn reached through the driver's side window and struck Mr. Smith in the mouth with his elbow. Officer Flynn then pulled Mr. Smith out of the car by his right arm and handcuffed Mr. Smith in an awkward position, with his arms lifted high in the air beyond the normal range of motion. Mr. Smith was charged with assault, but all charges against him were subsequently dropped. Mr. Smith's injuries included a torn rotator cuff, a torn biceps tendon, and chronic back pain. Upon information and belief, the case was settled for an unknown amount.

120.   In September 2009, Denver settled a wrongful death lawsuit for $225,000 to the family of Alberto Romero, who died after being repeatedly tasered and beaten with impact weapons by police when he was arrested wearing only boxer shorts. Before he died, Mr. Romero suffered eight broken ribs and had his tongue split open from the use of excessive force.

121.   On December 29, 2009, Vicki Lynn Trujillo filed a lawsuit on behalf of the Estate of Jason Gomez against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officer Timothy Campbell. Ms. Trujillo alleged that Officer Campbell began pursuing Mr. Gomez without reasonable suspicion or probable cause. When Officer Campbell confronted Mr. Gomez, he ordered Mr. Gomez to kneel on the ground and pointed his gun at him. Officer Campbell repeatedly shouted that he was going to kill Mr. Gomez. When Mr. Gomez, who was unarmed, stood up and began running from Officer Campbell, Officer Campbell shot him in the back. The bullet perforated Mr. Gomez's spinal column. Officer Campbell then fired a second round of shots, hitting Mr. Gomez twice in the chest, once in the

---

[14] David Packman, *Is There a Police Brutality Problem in Denver?*, INJUSTICE EVERYWHERE: THE NATIONAL POLICE MISCONDUCT STATISTICS AND REPORTING PROJECT, Sept. 6, 2010, http://www.injusticeeverywhere.com/?p=3028.

abdomen, once in the right thigh, and once in the left knee. Mr. Gomez died from multiple gunshot wounds. The case is currently awaiting trial in federal court.

122.    On March 16, 2010, Mark Ashford was walking his dogs when he witnessed Denver Police Officers pull over a driver for allegedly going through a stop sign. When Mr. Ashford informed the driver that he would be willing to testify that he saw the driver come to a complete stop, the officers focused on Mr. Ashford. When he began taking pictures of the scene, the officers attempted to wrestle the camera from Mr. Ashford, pushing, grabbing, and attempting to punch him to get him to the ground. Mr. Ashford was charged with interference and resistance, but the charges were dismissed. Mr. Ashford was transported from the scene by ambulance. He subsequently filed an excessive force complaint with the DPD.[15] In June 2011, Denver settled the case for $35,000.[16]

123.    On March 19, 2010, James D. Moore filed a lawsuit against the City and County of Denver and Denver Police Officers Shawn Miller and John Robledo. Mr. Moore alleged that Officers Miller and Robledo arrived at his apartment complex in response to a 9-1-1 call from his neighbor reporting a noise coming from Mr. Moore's apartment. When the officers arrived, Mr. Moore and his girlfriend were standing outside of his apartment. After instructing Mr. Moore, whose hands were not in his pockets, to remove his hands from his pockets, the officers tackled Mr. Moore from behind and struck him on the head without provocation or warning. While he was on the ground, Mr. Moore was beaten so brutally that he lost consciousness and his heart stopped. CPR had to be administered to save his life. The beating continued even after Mr. Moore was restrained, despite his repeated insistence that the officers had "the wrong guy." Mr. Moore suffered debilitating injuries as a result of his assault. He had to undergo back surgery and months of physical rehabilitation, and he now walks with a cane and cannot stand up for more than ten minutes without having to sit or lie down due to pain. The case is currently awaiting trial in federal court.

124.    In May 2010, Denver settled a lawsuit filed by Eric Winfield for $40,000. Mr. Winfield alleged that he was severely beaten by Denver Police Officers Antonio Milow, Boren Johnston, and Glen Martin while he was making his way through LoDo crowds after a 2007 World Series game. Mr. Winfield's injuries included chipped teeth, permanent scars, and nerve damage in his hands.[17]

125.    In June 2010, John Crespin filed a lawsuit against the City and County of Denver and Denver Police Officers Steven Castro, Todd Allum, Eric Sellers, and Joey Gasca. According to the lawsuit and media accounts, the officers followed 17-year-old Crespin home after he witnessed them using excessive force on a group of kids. Witnesses saw the officers

---

[15] Kieran Nicholson, *Another Alleged Beating Involving Denver Police Surfaces*, DENVER POST, Aug. 18, 2010, available at http://www.denverpost.com/news/ci_15816360.

[16] Sara Burnett, *Denver Police Force Settlements Now Top $1 Million for Year*, DENVER POST, June 14, 2011, available at http://www.denverpost.com/breakingnews/ci_18271068.

[17] Alan Prendergast, *Eric Winfield: Artist beaten by Denver cops gets cash, no apology*, WESTWORD, May 4, 2010, http://blogs.westword.com/latestword/2010/05/eric_winfield_artist_beaten_by.php.

kick Crespin's legs out from under him, use a chokehold on him, cuff him, and beat him with police batons for 15-20 minutes.[18]   The case is currently awaiting trial in federal court.

126.   In June 2010, Tyler Mustard filed a lawsuit against the City and County of Denver and Denver Police Officers Michael Morelock and Kimberly Thompson. Mr. Mustard alleged that Officer Morelock chased him on foot, tackled him to the ground, and beat him in the head, neck, and body. The Officers alleged that Mr. Mustard was spray painting a van and assaulted an officer; the criminal case against Mr. Mustard was dismissed. Denver City Council has agreed to settle the case for $117,000.[19]

127.   On July 1, 2010, Robert Duran filed a lawsuit against the City and County of Denver and Denver Sheriff's Deputy Steven Koehler. Mr. Duran alleged that, while he was waiting unescorted next to an elevator in the Denver County Jail as directed, Deputy Koehler approached him. Without warning or provocation, Deputy Koehler slammed Mr. Duran into the elevator wall. Deputy Koehler then dragged Mr. Duran approximately ten feet down the hallway. While Mr. Duran was handcuffed, Deputy Koehler kicked him all over his body and face. Mr. Duran was taken to the hospital by ambulance. Mr. Duran's injuries included scalp lacerations, bruised ribs, chest contusions, and closed head injury. The case is currently awaiting trial in federal court.

128.   In August 2010, Denver paid Chad Forte $22,500 to settle a lawsuit resulting from Denver Police Officer Kenneth Johnson's use of excessive force. After Mr. Forte allegedly jaywalked, Officer Johnson followed him into his apartment building and jumped him from behind, leaving him with facial injuries.[20]

129.   On September 20, 2010, Rohit Mukherjee filed a lawsuit against Denver Police Officer Abbegayle Dorn and two unknown John Doe Denver Police Officers. Mr. Mukherjee alleged that Denver Police Officers knocked on his door while he was hosting a party in his apartment. One of the officers asked Mr. Mukherjee to step outside. When he refused, one of the officers pushed his way into the apartment and Officer Dorn pinned Mr. Mukherjee against the door and choked him. When Mr. Mukherjee informed the officers that he could not breathe, one of them threw him to the ground, face first. One of the officers stood on Mr. Mukherjee's ankle and rocked back and forth. Once Mr. Mukherjee was restrained, the officers pushed him face first on the carpeted floor, causing contusions to his face. Mr. Mukherjee's guests then began recording the use of excessive force with their cell phones, at which point Officer Dorn took the cell phones without permission and placed them in a bowl of water in the kitchen in

---

[18] April M. Washington, *Denver Police Probe Alleged Beating by Four Officers*, ROCKY MOUNTAIN NEWS, Jan. 29, 2009, available at http://www.rockymountainnews.com/news/2009/jan/29/denver-police-probe-alleged-beating-by-four/.

[19] Deb Stanley, *Denver Paying Beating Victim $117K*, 7NEWS, June 7, 2011, available at http://www.thedenverchannel.com/news/28154851/detail.html.

[20] David Packman, *Is There a Police Brutality Problem in Denver?*, INJUSTICE EVERYWHERE: THE NATIONAL POLICE MISCONDUCT STATISTICS AND REPORTING PROJECT, Sept. 6, 2010, http://www.injusticeeverywhere.com/?p=3028.

order to destroy the photographic and video evidence of the police behavior. While Mr. Mukherjee was still restrained, the other officers stepped on and kneed Mr. Mukherjee's face and bent his fingers backwards as far as they could without breaking them. While escorting Mr. Mukherjee out of his apartment, the officers slammed his head into the hallways walls and the elevator wall. Mr. Mukherjee's injuries included jaw injuries, bruises, hand and knee pain, lacerations, knee contusion, hand sprain, and nerve damage. The case is currently awaiting trial in federal court.

130.    On November 23, 2010, Jared Lunn filed a lawsuit against the City and County of Denver, Denver Police Officer Eric Sellers, and unknown Denver Police Officer John Doe. Mr. Lunn alleged that after he attempted to report an assault to Officer Sellers, which Officer Sellers ignored, Officer Sellers assaulted him. Mr. Lunn was attempting to get into his friend's vehicle when he muttered, "way to protect and serve," in response to Officer Sellers' refusal to take his assault report seriously. Officer Sellers then wrapped his arm around Mr. Lunn's neck to pull him out of the car. Officer Sellers placed Mr. Lunn in a carotid compression hold. After Mr. Lunn went limp, Officer Sellers kicked his legs out from under him and threw him to the ground. After handcuffing Mr. Lunn, Officer Sellers got within inches of Mr. Lunn's face and yelled homophobic epithets at him. Officers Sellers then released Mr. Lunn without citing him for violation of any law and allowed him to go home. In June 2011, Denver settled the case for $45,000.[21]

131.    On January 12, 2011, Daniel Martinez, Jr., Nathan Martinez, Daniel Martinez III, and Jonathan Martinez (collectively, "the Martinez Family") filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Jason Valdez, Robert Martinez, Robert Motyka, and Bryce Jackson. The Martinez Family alleged that the officers began pounding on their door shortly after 11:00 pm, demanding that they open the door. When Daniel Martinez, Jr. opened the door slightly, the officers rushed into the house without consent or a warrant. Officer Valdez slammed Jonathan Martinez's head through a window and then pulled him outside of the house and slammed him onto the concrete to apply handcuffs. Officer Martinez pushed Daniel Martinez into the living room, pinned him against the sofa, and applied handcuffs. Officer Motyka punched Nathan Martinez in the face without any provocation. Officer Jackson forcefully dragged Daniel Martinez III from the house and slammed him into the concrete before applying handcuffs. All of the Martinez Family members were criminally charged. A jury acquitted Nathan Martinez and Daniel Martinez III on all charges. All of the charges against Daniel Martinez, Jr. and Jonathan Martinez were dropped. The case is currently awaiting trial in federal court.

---

[21] Sara Burnett, *Denver Police Force Settlements Now Top $1 Million for Year*, DENVER POST, June 14, 2011, available at http://www.denverpost.com/breakingnews/ci_18271068.

# V. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (42 U.S.C. § 1983 – 4th Amendment Violation – Excessive Force)
### (All Defendants)

132.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if set forth herein.

133.    Denver has a culture of tolerating excessive force by its law enforcement. Denver failed to discipline, train and supervise Officer Nixon concerning the Fourth Amendment and use of excessive force during arrests. Denver has tacitly approved rampant and widespread violence against Colorado's citizenry by its police force, and the physical abuses of Plaintiff is a foreseeable consequence of Denver's actions and inactions.

134.    Denver has a deliberate indifference to or tacit approval of its law enforcement's misconduct, which is performed through official custom, policy, or practice and that custom, policy, or practice, was the moving force behind Defendants' unconstitutional acts.

135.    Despite being put on notice of Officer Nixon's brutality towards citizens, especially towards citizens of color, Officer Nixon remained an active member of the DPD. A mere six months after nearly killing Mr. Landau, Denver's unconstitutional customs, policies, or practices failed to protect Plaintiff from Officer Nixon, and were the driving force behind Plaintiff's constitutional violations.

136.    Denver failed to properly hire, train, supervise and/or discipline members of its law enforcement regarding the proper use of physical force during arrest. This inadequate hiring, training and/or supervision results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Denver. Such failure to properly hire, train and supervise was the moving force behind and proximate cause of Defendants' use of excessive force against Plaintiff, and constitutes an unconstitutional policy, procedure, custom and/or practice.

137.    Plaintiff had a constitutionally protected and clearly established right to be secure in her person against unreasonable seizures of the person.

138.    Defendants unlawfully seized Plaintiff by means of excessive physical force and thereby unreasonably restrained her freedom.

139.    Defendants' actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

140.    Defendants' actions, as described above, were motivated by intent to harm Plaintiff.

141.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly and/or in reckless disregard of Plaintiff's federally protected rights.

142.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable law enforcement knew or should have known.

143.    Plaintiff has been and continues to be damaged by Defendants' use of excessive force against her.

144.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Plaintiff's damages.

145.    As a direct result of Defendants' unlawful action as described above, Plaintiff suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

146.    Denver's failure to train, discipline and/or supervise, as described herein, was a legal and proximate cause of Plaintiff's injuries.

147.    All individual Defendants to this claim, at all relevant times hereto, were acting under the color of state law in their capacities as Denver law enforcement officers.

148.    Defendants are not entitled to qualified immunity for the complained of conduct.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of First Amendment)
### (All Defendants)

149.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

150.    Plaintiff was engaging in constitutionally protected activity, including but not limited to her protest of DPD officers for their objectionable conduct.

151.    Plaintiff's speech was related to objectionable police conduct, a matter of important public concern.

152.    Defendants' unlawful seizure of Plaintiff, by means of excessive force, was substantially motivated as a response to Plaintiff's exercise of constitutionally protected conduct.

153.    Defendants' adverse actions in retaliation for Plaintiff's expressed intention of exercising her First Amendment rights and complaining about objectionable police conduct caused Plaintiff to suffer economic, physical and emotional injuries.

154.    Denver's failure to train, discipline and/or supervise, as described herein, was a legal and proximate cause of the Plaintiff's injuries.

155.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable law enforcement knew or should have known.

156.    Plaintiff's right to speak out on issues of public concern outweighed any of Defendants' rights.

157.    Defendants engaged in the conduct described by this Complaint willfully and maliciously and in reckless disregard of Plaintiff's federally protected constitutional rights.

158.    Plaintiff is constitutionally protected in her right to verbally oppose or challenge police action without risk of arrest.

159.    Plaintiff's First Amendment right permits her to communicate a significant amount of verbal criticism to law enforcement.

160.    The First Amendment requires Defendants to act with restraint in the face of verbal challenges to police action.

161.    As a direct result of Defendants' unlawful action as described above, Plaintiff suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

162.    Denver's failure to train, discipline and/or supervise, as described herein, was a legal and proximate cause of Plaintiff's injuries.

163.    All individual Defendants to this claim, at all relevant times hereto, were acting under the color of state law in their capacities as Denver law enforcement officers.

164.    Defendants are not entitled to qualified immunity for the complained of conduct.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in her favor and against each of the Defendants, and award her all relief allowed by law, including but not limited to the following:

    (a) All appropriate relief at law and equity;

    (b) Declaratory relief and other appropriate equitable relief;

    (c) Economic losses on all claims as allowed by law;

    (d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of companionship and association with family members, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

33

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g) Pre- and post-judgment interest at the appropriate lawful rate; and

(h) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFFS HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 7th day of July 2011.

KILLMER, LANE & NEWMAN, LLP

*S/ Qusair Mohamedbhai*

Qusair Mohamedbhai
Siddhartha H. Rathod
1543 Champa St., Ste. 400
Denver, CO 80202
(303) 571-1000
qmohamedbhai@kln-law.com
srathod@kln-law.com
ATTORNEYS FOR PLAINTIFFS